Pat O'LEAR, Kay Ann Chase, Steve Borrello, Lawrence Kestenbaum, Charlie Harrison, III, James Larkin, Christopher Smith, Donald Rittering, Barbara Long, George Gaines, and Minnie H. Whiting, Plaintiffs,

v.

Candice S. MILLER and Christopher Thomas, Defendants,

and

Michigan Republican Party, Patrick Miller, Andrew Pettress, and James L. Palaske, Defendant–Intervenors.

Case Number 01–72584–BC.

United States District Court,
E.D. Michigan,
Southern Division.

May 24, 2002.

R. Craig Hupp, F. Thomas Lwand, William B. Forrest, Bodman, Longley, Detroit, MI, for Plaintiffs.

Gary P. Gordon, Katherine C. Galvin, Michigan Department of Attorney General, Public Employment & Elections Division, Lansing, MI, for Defendants.

Jeffery V. Stuckey, Peter H. Ellsworth, Susan G. Schwochau, Pending App, Dick-

inson Wright, Lansing, MI, Michael A. Carvin, Louis K. Fisher, Pending App, Jones, Day, Washington, DC, for Defendant–Intervenors.

Lawrence Kestenbaum, Ann Arbor, MI, Pro se.

William Allen Simpson, Madison Heights, MI, Pro se.

Before BOYCE F. MARTIN, JR., Chief Circuit Judge, COOK and LAWSON, District Judges.

### OPINION AND ORDER GRANTING IN PART AND DENYING IN PART THE MOTIONS TO DISMISS, DISMISSING CLAIM III WITHOUT PREJUDICE, AND DISMISSING ALL OTHER CLAIMS WITH PREJUDICE

PER CURIAM.

Plaintiffs, a group of registered Michigan Democrats, bring this action challenging Michigan's 2001 congressional redistricting plan. They name Candice S. Miller, in her official capacity as Michigan's Secretary of State, and Christopher M. Thomas, in his official capacity as Michigan's Director of Elections, as defendants. The Michigan Republican Party, Patrick Miller, Andrew Pettress, and James L. Palaske have intervened as defendants.

Pursuant to Rule 12(b)(6) and 12(c) of the Federal Rules of Civil Procedure, defendants request that this court dismiss plaintiffs' lawsuit for failure to state a claim upon which relief can be granted. We grant defendants' motions in part, dismiss plaintiffs' equal protection claim without prejudice, dismiss plaintiffs' remaining claims with prejudice, and grant plaintiffs leave to amend their complaint within thirty days of the date of this Order.[1]

### I.

Assuming the truth of plaintiffs' factual allegations and construing the inferences from those allegations in the light most favorable to plaintiffs, the relevant facts are as follows.

On July 11, 2001, the Michigan legislature, by a virtual straight party-line vote, passed the congressional redistricting plan that is the subject of this lawsuit. On September 11, 2001, Michigan's governor signed the bill containing the challenged plan into law.

The districts in existence prior to the challenged plan's enactment were drawn in 1992 by a three-judge district court. *See Good v. Austin,* 800 F.Supp. 551 (E.D.Mich.1992). In the most recent elections conducted using the court-drawn districts, Democratic candidates received 54.8% of the majority-party vote. This percentage closely corresponds to the number of congressional seats Democrats currently control in Michigan, 9 out of 16—roughly 56.3% of the available seats.

Moreover, the margin by which Democrats carried the statewide vote increased from seven percentage points in 1996 (53.5% to 46.5%) to slightly more than nine percentage points in 2000. Given this increased margin, and given our obligation to construe the facts in the light most favorable to plaintiffs, we conclude for the purposes of our decision today that the Michigan electorate has been trending Democratic in recent years.

Despite the increasing majority of Democratic voters in Michigan, Republicans are likely to win ten of Michigan's fifteen congressional seats under the challenged plan. On the basis of this disproportionate

---

1. Because 42 U.S.C. § 1983 is not a source of substantive rights, we do not address plaintiffs' section 1983 claim. *See Albright v. Oliver,* 510 U.S. 266, 271, 114 S.Ct. 807, 127 L.Ed.2d 114 (1994); *Upsher v. Grosse Pointe Pub. Sch. Sys.,* 285 F.3d 448, 452 (6th Cir. 2002).

representation and its potential to continue for a prolonged period of time, plaintiffs claim that the challenged plan violates several provisions of the United States Constitution: Article I, sections 2 and 4 (as amended by section 2 of the Fourteenth Amendment), the Equal Protection Clause and the Privileges and Immunities Clause of the Fourteenth Amendment, and the First Amendment.

Plaintiffs also claim that the challenged plan limits the voting strength of Michigan's—staunchly Democratic—African-American voters by dispersing African-American populations throughout Republican districts. Plaintiffs, concede, however, that no African-Americans residing outside of Wayne County could conceivably reside in a majority-minority district and do not claim that the "dilution" of African American voting strength stems from racial—as opposed to political—animus. Nevertheless, plaintiffs claim that the challenged plan violates the Fifteenth Amendment and section 2 of the Voting Rights Act, 42 U.S.C. § 1973.

In addition to the purported deficiencies laid out above, plaintiffs claim the challenged plan's legitimacy is impaired by a host of procedural defects accompanying its enactment. The Michigan Supreme Court, however, resolved plaintiffs' procedural claims against them in *LeRoux v. Secretary of State*, 465 Mich. 594, 640 N.W.2d 849 (2002), and we do not address them here.

## II.

The standard for dismissal under Rule 12(b)(6) is identical to that for judgment on the pleadings under Rule 12(c). *Mixon v. State of Ohio*, 193 F.3d 389, 400 (6th Cir. 1999). Under that standard, we may not dismiss plaintiffs' complaint unless we are convinced that plaintiffs can prove no set of facts that would state a claim upon which relief could be granted. *Nelson v. Miller*, 170 F.3d 641, 649 (6th Cir.1999).

## A.

Our analysis of plaintiffs' equal protection claim begins with the Supreme Court's decision in *Davis v. Bandemer*, 478 U.S. 109, 106 S.Ct. 2797, 92 L.Ed.2d 85 (1986). There, Democratic plaintiffs challenged Indiana's 1981 reapportionment plan, claiming it represented an unconstitutional partisan gerrymander. In the first elections held under the 1981 plan, Democrats received 51.9% of the votes cast for seats in the Indiana House of Representatives statewide, but secured only 43 out of 100 seats. In the Indiana Senate, Democrats received 53.1% of the votes cast statewide, and 13 out of 25 Democratic candidates were elected. Relying on these election results, a three-judge district court found the reapportionment plan violated the Equal Protection Clause. The district court concluded that the 1981 plan was unconstitutional because it "purposely inhibit[ed] ... proportional representation," and was therefore unacceptable. *Id.* at 116, 106 S.Ct. 2797 (discussing the district court's opinion) (citation omitted).

The defendants appealed to the Supreme Court, arguing that the case was nonjusticiable and that the plaintiffs had failed to state a cognizable equal protection claim. *Id.* at 118, 106 S.Ct. 2797.

The Supreme Court found that partisan gerrymandering claims are justiciable under the Equal Protection Clause, but it rejected the district court's conclusion that the plaintiffs stated a cognizable equal protection claim. A plurality of the Court stated that to prevail on a valid partisan gerrymandering claim the plaintiff must prove "[1] intentional discrimination [2] against an identifiable political group and [3] an actual discriminatory effect on that group."[2] *Id.* at 127, 106 S.Ct.

---

**2.** A fragmented Court decided *Bandemer*. Be-

cause the opinion of *Bandemer's* four justice

2797. Having identified these elements, the plurality allowed as how the requirements "may be difficult of application." *Id.* at 142, 106 S.Ct. 2797. The Court's observation pointed primarily to the third element—proof of actual discriminatory effect—inasmuch as intent to discriminate against an identifiable group can readily be established in a partisan division of electoral districts. It is proof of the third element that the *Bandemer* Court found wanting in that case.

■ Here, like in *Bandemer*, the first two elements are easily satisfied. Defendants do not contest the intentional discrimination element. *Cf. id.* at 129, 106 S.Ct. 2797 ("As long as redistricting is done by a legislature, it should not be very difficult to prove that the likely political consequences of the reapportionment were intended."). Moreover, as registered Democrats, plaintiffs are an identifiable group. *See, e.g., Vieth v. Commonwealth of Penn.*, 188 F.Supp.2d 532, 544 (M.D.Pa. 2002) ("Clearly, by alleging that they are Pennsylvanian citizens who vote for Democrats, Plaintiffs have satisfied this requirement.").

■ It was in defining the third element—"an actual discriminatory effect"—that the Supreme Court reflected its reluctance to interfere with an essentially political—although justiciable—controversy which infuses all partisan gerrymandering cases. The Court acknowledged "the delicacy of intruding on this most political of legislative functions," *id.* at 143, 106 S.Ct. 2797, by setting a high threshold for demonstrating "an actual discriminatory ef-

fect." Consequently, a redistricting plan may be drawn "with the specific intention of disadvantaging one political party's election prospects," *id.* at 139, and may cause election results that are unfair because they are disproportional to the percentage of the population voting for that party on a state-wide basis, and yet not violate the Constitution. *Id.* at 132, 139. To prove unconstitutional discrimination, the under-represented political group must also show that "the electoral system is arranged in a manner that will consistently degrade a voter's or a group of voters' influence on the political process as a whole." *Id.* at 132, 106 S.Ct. 2797.

It is the task of the courts, then, to distinguish between those partisan redistricting plans which are merely unfair, as this one is alleged to be, and those which are unconstitutional. Drawing our guidance from *Bandemer*, we find that the allegations in the amended complaint do not adequately state that Michigan's redistricting plan will cause an actual discriminatory effect which results in a violation of the Equal Protection Clause.

■ *Bandemer's* standard for demonstrating an "actual discriminatory effect" is somewhat murky. The plurality's most definitive articulation of the requirements is as follows: "[U]nconstitutional discrimination occurs only when the electoral system is arranged in a manner that will *consistently degrade* a voter's or a group of voters' *influence on the political process as a whole.*" *Id.* at 110, 106 S.Ct. 2797 (emphasis added). For majority party plaintiffs, such as those before this court,

plurality provides the narrowest ground in support of its judgment, this court is bound by the plurality's reasoning. *See Marks v. United States*, 430 U.S. 188, 193, 97 S.Ct. 990, 51 L.Ed.2d 260 (1977) ("When a fragmented Court decides a case and no single rationale explaining the result enjoys the assent of five Justices, the holding of the Court may be

viewed as that position taken by those Members who concurred in the judgments on the narrowest grounds.") (internal citation and punctuation omitted). *See also Republican Party of North Carolina v. Martin*, 980 F.2d 943, 955 n. 22 (4th Cir.1992) (finding *Bandemer* plurality opinion binding under *Marks*).

this means "a finding of unconstitutionality must be supported by evidence of *continued frustration of the will of a majority of the voters*." *Id.* at 133, 106 S.Ct. 2797 (emphasis added).

In terms of the details underlying such proof, the *Bandemer* plurality never offered a checklist of features which together would comprise a systemic frustration of majority will. Rather, the Court found the lower court's conclusion unsupported because there was no finding that the election results in that case were preordained by Indiana's reapportionment act, especially in a "swing state" where block voting is not the unalterable norm and future election results could differ. Thus, there was no proof that the complaining group would retain minority status throughout the decade or that it had "no hope" of improving its fate in the next reapportionment. *See id.* at 135–36, 106 S.Ct. 2797.

■ In other words, disproportionate election results will not establish a constitutionally infirm districting plan without a showing of some substantial permanency to the arrangement that cannot be overcome through the political process. In ordering this requirement, the Court's focus was not on the political party but on the voters (or group of voters) who are denied the opportunity to participate—are essentially "shut out of the political process"—and who cannot achieve fair representation without the intervention of the courts. *Id.* at 136–37, 106 S.Ct. 2797. Thus, the *Bandemer* plurality observed that "[r]elying on a single election to prove

unconstitutional discrimination is unsatisfactory." *Id.* at 135, 106 S.Ct. 2797. This is especially true in a competitive state—like Michigan—where a moderate shift in voting trends could result in majority status for the minority party.

■ The plaintiffs in this case have not alleged that they have been shut out of the process or that the challenged congressional redistricting plan is one from which they cannot recover or substantially improve upon. For instance, in Bandemer, gubernatorial approval was necessary to sign an Indiana reapportionment bill into law. Because gubernatorial elections are determined by statewide races, which are presumably immune to gerrymandering of any sort, the *Bandemer* plaintiffs' chances of 'doing better' in the next reapportionment could similarly turn on circumstances beyond the actual effects of a partisan gerrymander, but wholly congruent with voter will.[3] Thus, the requirement of "permanency" is not significantly less applicable to plaintiffs' claim than it was to the claims of the *Bandemer* plaintiffs. *Cf. Terrazas v. Slagle*, 821 F.Supp. 1162, 1174 (W.D.Tex.1993) (finding a wronged partisan group could demonstrate discriminatory effects under *Bandemer* "if it presents evidence of a group perpetuating its power through gerrymandering in one political structure and that the wronged partisan group cannot over the long haul counteract this tactic through its influence in another relevant political structure or structures.").

Therefore, absent proof of discriminatory effect through some other avenue,

---

**3.** As opposed to identifying an actual *effect* of a partisan gerrymander, the "no chance of doing better" requirement seems to reflect the plurality's notions of judicial restraint. *Cf. Bandemer*, 478 U.S. at 134, 106 S.Ct. 2797 ("[I]t is also appropriate to require allegations and proof that the challenged legislative plan has had or will have effects that are *sufficiently serious to require intervention by the federal courts* in state reapportionment decisions.").

That is, the "no chance of doing better" requirement possibly reflects an effort to keep federal courts out of political disputes that are amenable to political solutions. Although it is awkward to apply the "no chance of doing better" requirement to the issue of whether plaintiffs have pled discriminatory effect, we cannot ignore the *Bandemer's* instruction that we do so.

plaintiffs' allegations cannot support a cognizable equal protection claim.

In rejecting both the district court's view and Justice Powell's concurring view as to what constitutes a cognizable equal protection claim, the *Bandemer* plurality suggested two alternative avenues through which plaintiffs could state a cognizable claim: (1) alleging that the challenged plan resulted in their complete exclusion from the political process or (2) alleging that elected officials would be wholly indifferent to plaintiffs' interests.[4] Because plaintiffs do not claim that victorious Republican candidates would be indifferent to the interests of their Democratic constituents or that they have been completely shut-out of the political process, they fail to state an equal protection claim upon which relief can be granted.

### 1.

The *Bandemer* district court found discriminatory effects sufficient to sustain an equal protection claim after the plaintiffs demonstrated that the proportion of Democratic candidates elected in the first election using the 1981 plan's districts did not correspond to the percentage of votes garnered by Democrats. The *Bandemer* plurality, however, rejected the notion that disproportionate representation alone could satisfy the discriminatory effects requirement. In rejecting the district court's conclusion, the plurality noted that in cases involving individual multimember districts, in which the Court had found an equal protection violation, the Court had available evidence suggesting that the excluded groups had "less opportunity to participate in the political process and to elect candidates of their choice." *Id.* at 131, 106 S.Ct. 2797. Because the *Bandemer* plurality was unwilling to presume, "without actual proof to the contrary," that elected candidates would "entirely ignore the interests of [the excluded groups];" it found that disproportionate representation alone would not diminish a group's elector-

4. Both alternate showings stem from the Court's earlier decisions involving racial gerrymandering claims in individual multimember districts. The *Bandemer* plurality recognized the distinction between claims brought by minority and majority plaintiff groups. *See Bandemer*, 478 U.S. at 133, 137, 106 S.Ct. 2797 (noting that "a finding of unconstitutionality must be supported by evidence of continued frustration of the will of a majority of the voters or effective denial to a minority of voters of a fair chance to influence the political process" and that the "participatory approach to the legality of individual multimember districts is not helpful where the claim is that such districts discriminate against Democrats").

Nevertheless, the *Bandemer* plurality did not suggest that the district context renders those showings inapplicable to majority party claims. Indeed, some courts have read the plurality's suggestion that these alternate proofs were *sufficient* to support an equal protection claim to indicate that such proofs were also *necessary* to an equal protection claim. *See, e.g., Badham v. March Fong Eu*, 694 F.Supp. 664, 668 (N.D.Cal.1988), *sum-*

*marily aff'd* 488 U.S. 1024, 109 S.Ct. 829, 102 L.Ed.2d 962 (1989) (refusing to sustain Republican claims of unlawful political gerrymandering where plaintiffs did not allege that they had been " 'shut out' of the political process" or "that anyone has ever interfered with Republican registration, organizing, voting, fund-raising, or campaigning").

We agree that a showing of this magnitude might be necessary when the plaintiffs seek to attack the design of a particular district with respect to contiguity, compactness, or other design factors that could, if sufficiently egregious, in fact interfere with core party functions or constituents' ability to influence their congress person. *See, e.g., Pope v. Blue*, 809 F.Supp. 392, 397 (W.D.N.C.) *summarily aff'd* 506 U.S. 801, 113 S.Ct. 30, 121 L.Ed.2d 3 (1992) (noting the disruptive effect a district could have that passes through three different media markets). Where the plaintiffs challenge a reapportionment plan as a whole, however, we do not read *Bandemer* to require this type of showing, although, as described above, we believe it certainly could provide alternate grounds for relief.

al power sufficiently to satisfy the discriminatory effects requirement.

Thus, *Bandemer* suggests that disproportionate representation combined with actual proof that elected officials would ignore the interests of the excluded group would satisfy its discriminatory effects requirement. Accordingly, plaintiffs' allegations of disproportionate election results, unaccompanied as they are by evidence of Republican indifference to Democratic citizen interests, cannot sustain plaintiffs' claim.

### 2.

In his concurring *Bandemer* opinion, Justice Powell suggested that a partisan gerrymandering plaintiff could establish an equal protection violation by demonstrating that the district boundaries were drawn solely to achieve partisan goals. *See Bandemer*, 478 U.S. at 161, 106 S.Ct. 2797. In its rejection of Justice Powell's approach, the plurality again referenced its previous individual multimember district decisions: "In those cases, the racial minorities asserting the successful equal protection claim had essentially been shut out of the political process." *Id.* at 139, 106 S.Ct. 2797; *see also id.* at 136, 106 S.Ct. 2797 (noting that in rejecting the plaintiffs' racial gerrymandering claim in *Whitcomb*

*v. Chavis*, 403 U.S. 124, 91 S.Ct. 1858, 29 L.Ed.2d 363 (1971), the Court had observed "that there was no proof that blacks were not allowed to register or vote, to choose the political party they desired to support, to participate in its affairs or to be equally represented on those occasions when candidates were chosen, or to be included among the candidates slated by the Democratic Party"). Thus, the *Bandemer* plurality suggested that partisan gerrymandering plaintiffs could state a cognizable equal protection claim by demonstrating that their group had been essentially "shut out of the political process."

Here, plaintiffs do not allege that they have been "essentially shut out of Michigan's political process."

Plaintiffs do not allege (1) that they have no chance of obtaining more favorable congressional districts in the next reapportionment; (2) that Republican candidates would be indifferent to the interests of Democratic citizens; or (3) that the challenged plan would result in Democrats being essentially "shut out" of the political process; therefore, plaintiffs do not state a cognizable equal protection claim. Nor does the amended complaint contain allegations from which these consequences could be inferred.[5]

---

5. The plaintiffs also claim that the Supreme Court in *Shaw v. Reno*, 509 U.S. 630, 113 S.Ct. 2816, 125 L.Ed.2d 511 (1993), and *Miller v. Johnson*, 515 U.S. 900, 115 S.Ct. 2475, 132 L.Ed.2d 762 (1995), suggested that the mere failure to use politically neutral redistricting principles itself violates the Equal Protection Clause. We find no support in either case for this proposition. The Supreme Court has in fact consistently acknowledged that political considerations inevitably play a major role in redistricting decisions:

It would be idle, we think, to contend that any political consideration taken into account in fashioning a reapportionment plan is sufficient to invalidate it. Our cases indicate quite the contrary. The very essence of districting is to produce a different—a

more 'politically fair'—result than would be reached with elections at large, in which the winning party would take 100% of the legislative seats. Politics and political considerations are inseparable from districting and apportionment. The political profile of a State, its party registration, and voting records are available precinct by precinct, ward by ward. These subdivisions may not be identical with census tracts, but, when overlaid on a census map, it requires no special genius to recognize the political consequences of drawing a district line along one street rather than another. It is not only obvious, but absolutely unavoidable, that the location and shape of districts may well determine the political complexion of the area. District lines are rarely neutral phenomena. They can well deter-

In *Bandemer*, the plurality expressed its confidence in our "abilities to distinguish between disproportionality *per se* and the lack of fair representation that continued disproportionality in conjunction with other indicia may demonstrate." *Bandemer*, 478 U.S. at 143 n. 21, 106 S.Ct. 2797. We find that the plaintiffs have alleged disproportionality in abundance, and that the amended complaint contains ample charges of discriminatory motive and procedural irregularities. The deficiency here is the lack of any claim of the "other indicia" which is required to show the discriminatory effect which *Bandemer* requires. Bandemer draws no bright lines, and neither do we attempt to set forth the *sine qua non* of an unconstitutional reapportionment scheme, except to say that the plaintiffs must set forth allegations which, if proven, justify court intervention into an essentially legislative process.

Mindful of *Bandemer's* murky nature and the relatively lenient standard for surviving a motion to dismiss, we will dismiss plaintiffs' equal protection claim without prejudice. Plaintiffs may file a complaint, amended to state a claim under our *Bandemer* analysis, within thirty days of the issuance of this Order.

### B.

■ Article I, section four provides, "The Times, Places and Manner of holding Elections for Senators and Representatives, shall be prescribed in each State by the Legislature thereof; but the Congress may at any time by Law make or alter such Regulations, except as to the Places of chusing Senators." U.S. Const., art I., § 4. Plaintiffs claim that the challenged plan represents an unconstitutional abuse of legislative power under section 4.

A state's power to subdivide itself into districts, however, does not stem from section 4. Rather, it stems from Article I, section 2, which provides "Representatives ... Shall be Apportioned Among the Several States." *See also* U.S. Const., amend. XIV, § 2; *Growe v. Emison*, 507 U.S. 25, 34, 113 S.Ct. 1075, 122 L.Ed.2d 388 (1993) (citing Article I, section 2 for the proposition that "the Constitution leaves with the States primary responsibility for apportionment of their federal congressional and state legislative districts").

Because section 2 governs intrastate redistricting, section 4's only applicability results from the Supreme Court's admonition that states may not use section 4 to "immunize" action that would otherwise be unconstitutional. *See Wesberry v. Sanders*, 376 U.S. 1, 6, 84 S.Ct. 526, 11 L.Ed.2d 481 (1964). The political gerrymander before this court is not otherwise unconstitutional; therefore, there is nothing to immunize and section 4 has no role to play.

Accordingly, we dismiss Claim I with prejudice.[6]

### C.

■ Plaintiffs claim that the challenged plan violates their "freedoms of speech and

---

mine what district will be predominantly Democratic or predominantly Republican, or make a close race likely. Redistricting may pit incumbents against one another or make very difficult the election of the most experienced legislator. The reality is that districting inevitably has and is intended to have substantial political consequences.
*Gaffney v. Cummings*, 412 U.S. 735, 752–53, 93 S.Ct. 2321, 37 L.Ed.2d 298 (1973) (internal citations omitted).

6. Because section 2 does not protect against partisan gerrymandering, *see Anne Arundel County Republican Central Committee v. State Administrative Board of Election Laws*, 781 F.Supp. 394, 398 (D.Md.1991) *summarily aff'd* 504 U.S. 938, 112 S.Ct. 2269, 119 L.Ed.2d 197 (1992), we dismiss Claim I in its entirety.

association in violation of the First Amendment of the United States Constitution." Partisan gerrymandering by itself, however, does not support either a freedom of speech or a freedom of association claim. *See, e.g., Washington v. Finlay,* 664 F.2d 913, 928 (4th Cir.1981) ("[W]here there is no device that directly inhibits participation in the political process, the First Amendment ... offers no protection of voting rights beyond that afforded by the [F]ourteenth and [F]ifteenth Amendments."); *Badham,* 694 F.Supp. at 675 ("While plaintiffs may be discouraged by their lack of electoral success, they cannot claim that [the reapportionment plan] regulates their speech or subjects them to any criminal or civil penalties for engaging in protected activities."). Thus, plaintiffs fail to state a claim under the First Amendment upon which relief can be granted.

Accordingly, we dismiss Claim II with prejudice.

### D.

The Privileges and Immunities Clause of the Fourteenth Amendment provides, "No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States." U.S. Const., amend XIV, § 1. For some time, the Privileges and Immunities Clause has been treated as "essentially dormant." *See, e.g., Pope,* 809 F.Supp. at 399 (quoting Laurence H. Tribe, *American Constitutional Law* 548 (2d ed.1988)). In *Saenz v. Roe,* 526 U.S. 489, 502, 119 S.Ct. 1518, 143 L.Ed.2d 689 (1999), however, the Supreme Court determined that the clause protects "the right of the newly arrived citizen to the same privileges and immunities enjoyed by other citizens of the same State." Plaintiffs argue that *Saenz* "breathe[d] new life into the clause." (citing *Saenz,* 526 U.S. at 511, 119 S.Ct. 1518) (Rehnquist, C.J., dissenting). They claim that the challenged plan violates the revitalized Privileges and Im-

munities Clause by denying Democratic voters the right—enjoyed by Republican voters—to fair representation and an effective vote.

We can find no overt support for the proposition that the Privileges and Immunities Clause protects the right to fair representation or the right to an effective vote. *Cf. Pope,* 809 F.Supp. at 399. Moreover, without more explicit guidance, we are reluctant to infer such protection from the Supreme Court's treatment of newly arrived state citizens. Accordingly, we dismiss Claim IV with prejudice.

### E.

In *Thornburg v. Gingles,* 478 U.S. 30, 106 S.Ct. 2752, 92 L.Ed.2d 25 (1986), the Supreme Court articulated three preconditions to a cognizable vote-dilution claim under section 2 of the Voting Rights Act:

1. "[T]he minority group must be able to demonstrate that it is sufficiently large and geographically compact to constitute a majority in a single-member district."

2. "[T]he minority group must be able to show that it is politically cohesive."

3. "[T]he minority must be able to demonstrate that the white majority votes sufficiently as a bloc to enable it ... usually to defeat the minority's preferred candidate."

*Id.; see also Voinovich v. Quilter,* 507 U.S. 146, 156–57, 113 S.Ct. 1149, 122 L.Ed.2d 500 (1993) (holding that "the *Gingles* preconditions apply in challenges to single-member as well as multimember districts"); *Cousin v. Sundquist,* 145 F.3d 818, 823 (6th Cir.1998) ("[A] section 2 claim cannot proceed unless all three *Gingles* preconditions are satisfied.").

Plaintiffs admit that "[o]utside of Wayne County, *blacks in Michigan would*

*not reside in a majority-black district under any redistricting plan."* Moreover, plaintiffs acknowledge that, under the challenged plan, "the entire African American population of Detroit [in Wayne County] has been placed in two districts (the Thirteenth and Fourteenth) *that offer ample opportunity to elect black-preferred candidates."* (emphasis added). Thus, minority voters cannot demonstrate that their numbers are sufficiently large and geographically compact to constitute a majority in a single-member district, other than in the two districts where they have "ample opportunity to elect black-preferred candidates."

In an effort to salvage their moribund section 2 claim, plaintiffs argue that the challenged plan's failure to construct districts that would permit minorities to "have a significant impact on congressional elections" constitutes a section 2 violation.

The Supreme Court has not expressly decided whether section 2 permits influence claims. *See Voinovich,* 507 U.S. at 154–57, 113 S.Ct. 1149 (assuming, without deciding, that an influence claim was actionable). In *Cousin,* however, the Sixth Circuit rejected the idea that an impairment of minority voters' ability to influence, rather than determine, the outcome of an election supported a cognizable section 2 claim. *Cousin,* 145 F.3d at 828–29 ("[W]e do not feel that an 'influence' claim is permitted under the Voting Rights Act.").

Because plaintiffs cannot satisfy the *Gingles* preconditions and because we do not recognize "influence" claims, plaintiffs cannot state a claim under the Voting Rights Act. Accordingly, we dismiss Claim VII with prejudice.

### F.

The Fifteenth Amendment states, "The right of citizens of the United States to vote shall not be denied or abridged by the United States or by any State on account of race, color or previous condition of servitude." U.S. Const. amend XV, § 1. As discussed above, plaintiffs cannot state a cognizable vote dilution claim; therefore, we need not address whether the Fifteenth Amendment covers plaintiffs' vote dilution claim. Because plaintiffs do not allege racial animus, they cannot state a cognizable claim under the Fifteenth Amendment. *City of Mobile, Alabama v. Bolden,* 446 U.S. 55, 61–66, 100 S.Ct. 1490, 64 L.Ed.2d 47 (1980) (plurality decision). Accordingly, we dismiss Claim V with prejudice.

### III.

It is **ORDERED** that plaintiffs' equal protection claim is dismissed without prejudice and plaintiffs' remaining claims are dismissed with prejudice. Plaintiffs may amend their complaint within thirty days of the date of this Order. If plaintiffs do not amend their Complaint within 30 days, the matter shall be closed, and further challenges to the redistricting plan based on new evidence after subsequent elections, if any, shall require a new filing. Our determination today does not change the application of our April 24, 2002, Order imposing a June 11, 2002, deadline for receiving nominating petitions, which remains in full force and effect.