William **MALLORY**, et al.,
Plaintiffs–Appellants,

v.

The State of **OHIO**, et al., Defendants–
Appellees.

No. 97–4425.

United States Court of Appeals,
Sixth Circuit.

Argued March 10, 1999.

Decided April 13, 1999.

Peter J. Randolph (briefed), Cincinnati, OH, Thomas I. Atkins (briefed), Brooklyn, NY, James L. Hardiman (argued and briefed), Hardiman, Buchanan, Howland & Trivers, Michele R. Comer (briefed), Cleveland, OH, for Plaintiffs–Appellants William Mallory, Hazel L. Bland, Charles W. Cross, Robert Dogan, Donald H. Ells, Jessie Gooding, Jeffrey D. Johnson, Casey C. Jones, C Prentiss, Deborah Stokes–Abraham and Vernon Sykes.

Thomas I. Atkins, Brooklyn, NY, James L. Hardiman, Hardiman, Buchanan, Howland & Trivers, Cleveland, OH, for Plaintiff–Appellant Gladys M. Walcott.

Norton Victor Goodman (argued and briefed), Orla E. Collier, III (briefed), Mark D. Tucker (briefed), John F. Stock (briefed), Benesch, Friedlander, Coplan & Aronoff, Columbus, OH, for Defendants–Appellees.

Before: SILER, DAUGHTREY, and GILMAN, Circuit Judges.

GILMAN, Circuit Judge.

William Mallory and eleven other plaintiffs, representing a class comprised of the voting-age population of African–Americans entitled to vote in judicial elections in eight of Ohio's largest counties ("the class"), sued the state of Ohio for alleged violations of Section 2 of the Voting Rights Act, 42 U.S.C. § 1973. The class alleged

that Ohio's "at-large" election system for judges impermissibly dilutes the voting strength of African–Americans. These claims were tried before the district court in February of 1997. The district court issued findings of fact and conclusions of law in which it rejected each of the class's claims, holding that the class had failed to prove that African–Americans were denied the equal opportunity to elect judges of their choice. For the reasons set forth below, we **AFFIRM** the judgment of the district court.

## I. BACKGROUND

In a carefully written, solidly reasoned, and extremely comprehensive opinion, the Honorable George C. Smith has set forth the district court's findings of fact and conclusions of law that we hereby adopt as our own. *See* 38 F.Supp.2d 525 (S.D.Ohio 1997). We write further simply to summarize the salient issues and address several points raised on appeal by the class.

In order to understand the class's contentions, we must first review the basic allegations contained in its complaint. This case challenges the "at-large" election of state appellate and trial court judges in eight of Ohio's most populous counties. In its complaint, the class alleged that this system, by which all voters within a specified jurisdiction vote for all of the positions, as opposed to voting in districts, impermissibly dilutes the voting strength of African–Americans. With a few minor exceptions, candidates for judicial office in Ohio also run for "numbered posts," *i.e.*, they are candidates for specific judicial seats.

Under Article IV, § 6(A) of the Ohio Constitution, the electoral districts of all state courts are "linked" to the territorial jurisdictions of the courts. For example, the judges of the courts of appeal are elected by voters in their respective districts, and municipal court judges are elected by voters in their municipality. There are also a number of constitutional and statutory qualifications to run for judi-cial office, chief among them being admission to the Ohio State Bar and residence within the jurisdiction of the court to which election is sought.

In April of 1995, the 12 named plaintiffs filed suit against the state of Ohio, claiming violations of the Voting Rights Act, the United States Constitution, and the Ohio Constitution. The United States District Court for the Southern District of Ohio certified a class comprised of the voting-age population of African–Americans entitled to vote in each of the challenged judicial districts. It subsequently granted the state's motion for summary judgment on the constitutional claims, holding that the class had failed to raise a material issue of fact with respect to whether the state had purposefully discriminated against it. The district court also granted summary judgment in favor of the state on the Voting Rights Act claims for 2 of the 20 challenged judicial districts. It held that the state was entitled to summary judgment as to these two districts because the class had failed to demonstrate, as the Voting Rights Act requires, that African–Americans could constitute a geographically compact majority in a hypothetical single-member district for the Sixth District Court of Appeals and the Court of Common Pleas for Stark County. The class does not appeal any of the issues decided on summary judgment.

The remaining claims were tried before the district court in February of 1997. Although it found that race is sometimes a factor in Ohio judicial races, the district court concluded that it is a relatively minor one, especially when compared to factors such as political affiliation and incumbency. The district court went on to apply the three *"Gingles* preconditions," a set of three necessary, but not sufficient, conditions for a plaintiff to succeed in a Voting Rights Act claim. *See Thornburg v. Gingles*, 478 U.S. 30, 49–51, 106 S.Ct. 2752, 92 L.Ed.2d 25 (1986). These three preconditions are geographical compactness, politi-

cal cohesion, and evidence of majority bloc voting.

The district court held that the class had established the first precondition, geographical compactness, with regard to 4 of the 18 judicial districts remaining before the court. For the other 14 districts, however, the district court found that although there was a sufficient number of African–Americans to constitute a majority in a hypothetical district, those African–Americans were not geographically compact.

The district court further concluded that the class had failed to satisfy the second and third *Gingles* preconditions with respect to each challenged judicial district. First, the district court held that the class had failed to satisfy its burden of demonstrating that African–Americans are "politically cohesive" in the challenged districts. Instead of presenting statistical evidence that examined the outcomes of the elections in question, the class relied on the uncorroborated opinions of various African–American voters. The district court, on the other hand, credited the testimony of the state's expert, who, after exhaustively examining the relevant statistics, was of the opinion that African–Americans in the challenged judicial districts were not politically cohesive.

Second, the district court held that the class had failed to prove the existence of "legally significant racial bloc voting," such that Caucasian voters vote sufficiently as a bloc to consistently defeat the candidates preferred by African–Americans. The district court again credited the state's expert, who testified that the candidate preferred by most African–American voters was often supported by large numbers of Caucasian voters.

■ Even if the *Gingles* preconditions had been satisfied, the district court found that the class had failed to meet its ultimate burden of persuasion in a Voting Rights Act case. This burden required the class to show that, under the totality of the circumstances, African–American vot-

ers in the challenged districts have less opportunity than other members of the electorate to participate in the political process and elect candidates of their choice. Finally, the district court held that even if the class had satisfied all of its burdens, the court was without the power to impose a remedy because all potential remedies would impermissibly alter the structure of Ohio's judicial system. This appeal followed.

## II. ANALYSIS

### A. Standard of review

■ In considering the class's arguments on appeal, we review *de novo* the district court's interpretation of the relevant law, but review its factual findings under the "clearly-erroneous" standard. *See Thornburg v. Gingles,* 478 U.S. 30, 79, 106 S.Ct. 2752, 92 L.Ed.2d 25 (1986). Whether an electoral system has diluted the voting power of a minority group is a factual question. Because determinations of vote dilution are "peculiarly dependent upon the facts of each case," the Supreme Court has stated that "the clearly-erroneous test . . . is the appropriate standard for appellate review. . . ." *Id.*

### B. The *Gingles* preconditions

This action was brought under Section 2 of the Voting Rights Act, which provides as follows:

(a) No voting qualification or prerequisite to voting or standard, practice, or procedure shall be imposed or applied by any State or political subdivision in a manner which results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color, or in contravention of the guarantees set forth in section 1973b (f)(2) of this title, as provided in subsection (b) of this section.

(b) A violation of subsection (a) of this section is established if, based on the totality of circumstances, it is shown that the political processes leading to

nomination or election in the State or political subdivision are not equally open to participation by members of a class of citizens protected by subsection (a) of this section in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice. The extent to which members of a protected class have been elected to office in the State or political subdivision is one circumstance which may be considered: *Provided,* That nothing in this section establishes a right to have members of a protected class elected in numbers equal to their proportion in the population.

42 U.S.C. § 1973 (emphasis in original).

In *Thornburg v. Gingles,* 478 U.S. 30, 106 S.Ct. 2752, 92 L.Ed.2d 25 (1986), the Supreme Court interpreted the above-quoted language to establish three "necessary preconditions" to a successful § 2 challenge by a minority group. This court has summarized the requirements as follows:

> First, the minority group must be able to demonstrate that it is sufficiently large and geographically compact to constitute a majority in a single-member district. . . . Second, the minority group must be able to show that it is politically cohesive. . . . Third, the minority must be able to demonstrate that the white majority votes sufficiently as a bloc to enable it—in the absence of special circumstances, such as the minority candidate running unopposed—usually to defeat the minority's preferred candidate.

*Clarke v. City of Cincinnati,* 40 F.3d 807, 811 (6th Cir.1994) (ellipses in original) (quoting *Gingles,* 478 U.S. at 50–51, 106 S.Ct. 2752). If these three preconditions are met, a variety of other factors are then examined to determine whether, given the "totality of the circumstances," the multi-member electoral district has in fact "diluted" the minority's electoral strength and thus denied members of the minority group a fair opportunity to elect represen-tatives of their choice. *See Clarke,* 40 F.3d at 811.

On appeal, the class addresses the *Gingles* preconditions only obliquely, preferring instead to focus on a set of related issues set forth in Part II.C. below. The class's brief, however, acknowledges that the *Gingles* preconditions must be satisfied in order for it to prevail. Because these preconditions are essential to its case, we now turn to the class's proof on each of them.

### 1. Geographical compactness

The first *Gingles* precondition requires that the "minority group must be able to demonstrate that it is sufficiently large and geographically compact to constitute a majority in a single-member district." *Gingles,* 478 U.S. at 50, 106 S.Ct. 2752. The Court went on to note that if the minority group cannot show that such a district could be formed, it follows logically that the at-large system is not the cause of the alleged electoral inequities. *See id.*

The district court carefully reviewed the materials submitted by both parties and concluded that there was a sufficient number of African–Americans living somewhere within each judicial district to constitute a majority in a hypothetical single-member district. It stated, however, that the class had the burden of showing that those minority voters lived in a geographically compact pattern such that it would be possible to draw a "majority-minority" district with a rational shape. With regard to 14 of the 18 challenged judicial districts, the district court concluded that the class had failed to prove that such a district could be drawn. The district court, however, found that the class had met its burden with respect to the First District Court of Appeals, as well as the Cuyahoga, Hamilton, and Franklin Courts of Common Pleas. No appeal was taken by the state from this determination.

The class implicitly challenges the district court's determination that geo-

graphically compact, single-member districts could not be drawn in the 14 other judicial districts. But the only evidence submitted by the class to demonstrate geographical compactness was a set of maps that purported to show the concentration of African–American populations within each of Ohio's largest counties. These maps, however, did not indicate the number of Caucasians within the relevant areas or indicate the relevant census tracts, which is typically needed to draw an electoral district. The class does not dispute the district court's characterization of the maps, nor does it point to further evidence that geographically compact, single-member district could be drawn. In short, while the class offers the bare conclusion that the district court erred, it does not explain how it did so. We therefore find no error in the district court's determination that the class failed to show that geographically compact, single-member districts could be drawn in which African–Americans would constitute a majority.

### 2. Political cohesion

■ The second *Gingles* precondition is that "the minority group must be able to show that it is politically cohesive." *Gingles*, 478 U.S. at 51, 106 S.Ct. 2752. The Court reasoned that if a minority group does not tend to vote together, the challenged electoral system cannot be responsible for the group's alleged inability to elect candidates of its choice. *See id.* As explained by the Court, it is the plaintiff's burden to show that voters in the minority group have a candidate, regardless of that candidate's race, that the group would prefer to elect. *See id.* at 67–70, 106 S.Ct. 2752. Although the Court did not set out a precise mathematical formula to determine when a minority group is cohesive, it indicated that a showing that "a significant number" of minority voters "usually" vote for the same candidate would satisfy the plaintiff's burden. *Id.* at 56, 106 S.Ct. 2752.

■ At trial, witnesses for the class repeatedly testified as to their belief that "blacks tend to vote for blacks and whites tend to vote for whites." The class, however, presented no statistical evidence to support these claims. Only the "Adrine Report," an analysis of judicial elections involving the Cuyahoga County Court of Common Pleas authored by Judge Ronald B. Adrine of the Cleveland Municipal Court, purports to supply such evidence. Judge Adrine testified, however, that his report was not a statistical analysis of racial bloc voting, or, more importantly, a study of all of the challenged districts.

The state, on the other hand, offered the testimony of Dr. Gary King, a Harvard professor and Director of the Harvard/MIT Data Center. According to the district court, he is the world's foremost authority on the statistical analysis of racial bloc voting. Dr. King's techniques have been widely recognized in the academic community and utilized in other voting rights cases. Dr. King concluded that the evidence did not show a consensus "candidate of choice" among African–Americans in the challenged districts. He further found that the degree of racial bloc voting varied widely from election to election, and that candidates supported by African–Americans were routinely supported by significant numbers of Caucasian voters. Finally, Dr. King concluded that there was no legally significant racially polarized voting in any of the challenged districts. He found numerous instances in which African–American candidates were elected with the significant support, sometimes even by a majority, of Caucasian voters.

On appeal, the class makes no claim that the district court erred in concluding that the minorities did not vote as a bloc in the challenged judicial districts, nor does it point to any evidence that the district court overlooked. The district court's decision was based on the only testimony presented by either party regarding the actual electoral results in the challenged

districts. It was required to make a finding of fact, and it chose to rely on the valid, comprehensive scientific study by Dr. King instead of an unscientific report on a single judicial district and the subjective experience of several voters. We find no error in the decision of the district court to accept the state's version of the facts.

### 3. Bloc voting

The final *Gingles* precondition is that "the minority must be able to demonstrate that the white majority votes sufficiently as a bloc to enable it—in the absence of special circumstances, such as the minority candidate running unopposed—usually to defeat the minority's preferred candidate." *Gingles,* 478 U.S. at 51, 106 S.Ct. 2752 (internal citation omitted). The Court explained that by satisfying this third precondition, the minority group establishes that its submergence in a Caucasian multi-member district impedes its ability to elect its chosen representatives. *See id.*

In explaining the differences between this precondition and the previous one, this court has stated that

> [b]oth the second and third *Gingles* preconditions thus require a court to consider the voting behavior of different races. However, the inquiry in the second pre-condition differs from that involved in the third: the former asks merely whether voters of the same race tend to vote alike, and the latter evaluates whether "a bloc-voting majority can routinely outvote" the minority, thereby "impair[ing] the ability of a protected class to elect candidates of its choice."

*Cousin v. Sundquist,* 145 F.3d 818, 823 (6th Cir.1998) (second bracket in original) (quoting *Johnson v. DeGrandy,* 512 U.S. 997, 114 S.Ct. 2647, 129 L.Ed.2d 775 (1994)).

At trial, the class presented no evidence that Caucasians tend to vote as a bloc, other than the unsubstantiated testimony of various African–American voters. Such testimony was contradicted by Dr. King, who found no evidence of legally significant racially polarized bloc voting. On appeal, the class was unable to point to any evidence that the district court overlooked on this issue. We therefore conclude that the district court committed no error in finding that the class failed to sustain its burden of proving bloc voting by the Caucasian majority.

### C. The class's arguments on appeal

The class sets forth a series of arguments on appeal that are only tangentially related to the *Gingles* preconditions. In the interests of thoroughness, we have summarized them below.

### 1. Chilling effects

The class argues that the district court erred because it disregarded testimony that Ohio's electoral system discourages minorities from running for judicial office. To the contrary, the district court concluded that "[b]ecause candidates who do not run cannot be elected, it is impossible to statistically measure this so-called chilling effect." Although conceding that this statement is technically accurate, the class labels it "cynical," and accuses the district court of a "lack of understanding of the continuing impact of racially discriminatory practices" that, when "coupled with patterns of consistent racial bloc voting," deters "African Americans from fully participating in the judicial electoral process." The class further complains that the district court analyzed only those elections in which African–American candidates participated.

■ Although the class argues that the district court failed to take account of the alleged "chilling effect," it provides no legal support for its argument. The class cites no case that holds that a § 2 claim may proceed in the absence of statistical evidence of racial bloc voting. Furthermore, the charge that the district court ignored patterns of racial bloc voting is unsupportable, because the class was un-

able to prove that such voting occurred. Finally, the claim that the district court erred in not looking at elections in which African–Americans did not run is without merit. Based upon the statistics offered by both sides at trial, the district court concluded that African–American attorneys in the challenged districts are actually more likely to be elected to the bench than are their Caucasian colleagues.

The class, however, cites three cases from other circuits for the proposition that district courts should consider the possibility that African–Americans do not run because they cannot win. *See Nipper v. Smith,* 1 F.3d 1171, 1179–80 (11th Cir. 1993); *Westwego Citizens for Better Gov't v. Westwego,* 872 F.2d 1201, 1208–09 n. 9 (5th Cir.1989); *McMillan v. Escambia County,* 748 F.2d 1037, 1045 (5th Cir.1984). But even if this circuit were to adopt such an approach, it would only apply in a case where there was evidence that African–Americans could not win. Here, the evidence shows exactly the opposite.

### 2. The particularized needs of the minority group

■ The class also contends that the district court erred because it ignored testimony that the lack of African–American judges undermines the perceptions of African–Americans regarding the fairness of the judiciary. Although the class hastens to point out that it does not allege the absence of impartial justice, it claims that the perception of justice is being damaged.

Whatever the merits of this issue as a political matter, no court has ever held that such a contention is relevant to a § 2 case. The class is unable to cite a single case adopting this theory, and the claim finds no support in the language of the Voting Rights Act.

### 3. The district court's "fear" of single-member districts

■ The class expends much energy contesting the district court's conclusion that it lacked the power to order the reme-

dy of single-member judicial districts, going so far as to attack the court for its "fear" of that remedy. This claim, however, is not relevant because the issue of a remedy arises only after a violation of the Voting Rights Act has been established. Because such a violation was not shown, it is unnecessary to reach the class's contentions on this issue.

### 4. The state's allegedly inconsistent application of "linkage"

■ The class also challenges the district court's finding that the state has a substantial interest in the "linkage" of a court's jurisdiction to the judge's electoral district. In response, the state explains that jurisdiction-wide accountability helps insulate judges from the pressures of special interest groups and particular segments of the electorate. Judges, the state claims, must avoid being accountable to only a certain segment of those persons over whom the court's jurisdiction extends, for fear that such a system would give the appearance of favoritism.

The class claims that in evaluating the totality of the circumstances, the district court gave too much weight to Ohio's alleged interest. This is especially true, it says, because the state is inconsistent in its application of the policy. In support of this argument, the class points out that some municipal courts are county-wide, while others are municipally based. Although the class correctly describes the court systems of the several counties, the state established that the principle of linkage is nevertheless consistently applied within those jurisdictions. We concur in the district court's conclusion that the state of Ohio has a legitimate interest in linkage, and find no error in its discussion of this issue.

### 5. "Anti-single shot" devices

■ Finally, the class contends that "the use of anti-single shot devices in the challenged courts dilutes minority voting

opportunities." Anti-single-shot devices are electoral elements that prevent voters from concentrating all of a voter's available votes for a single candidate. Examples include "numbered posts," by which, say, four open seats are filled in four separate contests instead of one, or staggered terms, such that only one seat is filled in any given election. It is undisputed that Ohio in fact utilizes numbered posts.

■■■■■ This claim is essentially an alternate theory of liability under the Voting Rights Act. Because it was apparently not raised in the district court below, the class has waived its right to argue the point on appeal. *See White v. Anchor Motor Freight, Inc.*, 899 F.2d 555, 559 (6th Cir. 1990) ("This court will not decide issues or claims not litigated before the district court.") Furthermore, the claim is unavailing in any event because the class is still required to prove the same *Gingles* preconditions to make out a dilution claim, regardless of the precise mechanism alleged to be its cause. Because these preconditions were not established, this claim is without merit.

### III. CONCLUSION

For all of the reasons set forth above, we **AFFIRM** the district court's judgment for the state of Ohio.