**Fred PARKER, et al, Plaintiffs,**

v.

**The State of OHIO, Ohio
Apportionment Board,
et al, Defendants.**

**No. C2–01–1132.**

United States District Court,
S.D. Ohio,
Eastern Division.

May 23, 2003.

Donald Joseph McTigue, Esq., Percy Squire, Esq., Columbus, for Plaintiffs.

Norton Victor Goodman, Esq., Benesch, Friedlander, Coplan & Aronoff, Columbus, for Defendants.

Before BOYCE F. MARTIN, Jr., Chief Circuit Judge, GRAHAM, and GWIN, United States District Judges.

## OPINION AND ORDER

BOYCE F. MARTIN, Jr., Chief Circuit Judge.

Plaintiffs bring an action for declaratory and injunctive relief. They seek the invalidation of the 2001 apportionment plan for election of the Ohio General Assembly. They allege violations of Section 2 of the Voting Rights Act (as amended, at 42 U.S.C. § 1973) and of the Fourteenth and Fifteenth Amendments to the United States Constitution. These plaintiffs allege that minority voters, specifically African–Americans, were precluded from achieving political efficacy by the new apportionment plan.

The plaintiffs are voters residing in the challenged districts and are generally those persons protected under the Voting Rights Act. Defendants Taft, Blackwell, Petro, and Householder are elected officials of the State of Ohio and members of the Ohio Apportionment Board, by virtue of their elected positions.[1] Plaintiffs claim that the Apportionment Board drafted an apportionment plan diluting the ability of Ohio's African–Americans to elect candidates of their choice. Specifically, the plaintiffs challenge House Districts 19, 20, 21, 25, 26, 27, 28, 29, 31, 32, 33, and 60. Plaintiffs also challenge Senate Districts 5 and 15.

Under the Ohio Constitution, decennially, after the federal census, Ohio is subdivided into ninety-nine state House of Representatives districts. According to the ratio of Ohio's population to those ninety-nine districts, the ideal legislative district size is 114,678. A variance of five percent, or 5,733, is permissible. As a result, districts vary from 120,411 to 108,945.

According to the 2000 census, Ohio is the seventh most populous state in the Union with 11,353,140 people. African–Americans comprise eleven and a half percent of the population, at 1,305,611 people. The African–American population of Ohio lives predominantly in the state's most urban counties, including those at issue in this litigation.

The legislative provisions governing the Apportionment Board are found in Article X of the Ohio Constitution. The Apportionment Board consists of the Governor (Taft), the Secretary of State (Blackwell), the Auditor of State (Petro), and two persons chosen by legislative leaders. In this instance, Ohio Speaker of the House Householder was chosen, as was State Senator Herington, who is a plaintiff in this case.

Following an initial meeting, at which the Board appointed Taft as Chairman and Scott P. Borgemenke as Secretary, the "Majority Members" of the Board directed Borgemenke to draft and submit a new apportionment plan on their behalf. The Majority Members (Taft, Blackwell, Petro and Householder) were those from the party holding a majority in the state houses, the Republican party. Borgemenke was directed to submit a plan that complied with the Ohio Constitution, the United States Constitution, and the Voting Rights Act. Defendants maintain that the Ohio Constitution was the predominant basis for Borgemenke's plan. He submitted the plan to the Board, as required by the rules, on September 24, 2001. The Ohio Republican Party, Plaintiffs Senator Leigh Herington and Ohio House Minority Leader Dean E. DePiero, and the NAACP also timely submitted plans for reapportionment.

The Board reconvened on both September 26 and October 1 to consider the plans

---

1. For ease of identification, we will refer throughout this opinion to the plaintiffs as those who object to the reapportionment plan and to the defendants as those who created and support the reapportionment plan.

and to hear testimony and other evidence on the respective plans. At the October 1 meeting, the Board adopted a series of technical changes to the Borgemenke plan, as well as a series of changes requested by Democratic members of the General Assembly. The Apportionment Board then adopted the Borgemenke plan as amended.

This suit arises out of that plan. Plaintiffs claim that the African–American vote, in Ohio as a whole and more specifically in Franklin, Hamilton, Mahoning, and Montgomery counties, has been diluted by the new apportionment plan.

In making the case against the defendants, plaintiffs must first show that they have standing to sue. In *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560–561, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992) (internal citations, quotation marks, and footnote omitted), the Supreme Court held that the

> irreducible constitutional minimum of standing contains three elements. First, the plaintiff must have suffered an injury in fact—an invasion of a legally protected interest which is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical ... Second, there must be a causal connection between the injury and the conduct complained of—the injury has to be fairly ... trace[able] to the challenged action of the defendant, and not ... th[e] result [of] the independent action of some third party not before the court.... Third, it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.

In *United States v. Hays,* 515 U.S. 737, 115 S.Ct. 2431, 132 L.Ed.2d 635 (1995), the Supreme Court had an opportunity to revisit the standing issue in a way instructive to the question before us today. The Court said, "we have repeatedly refused to recognize a generalized grievance against

allegedly illegal governmental conduct as sufficient for standing to invoke the federal judicial power." *Id.* at 743, 115 S.Ct. 2431. The Court went on to say, "The rule against generalized grievances applies with as much force in the equal protection context as in any other." *Id.*

Because of this rule, plaintiffs, in cases such as this one, who challenge a state's reapportionment plan on equal protection grounds claiming the plan has been racially gerrymandered, must show that they live in a district so affected. The *Hays* Court recognized that "Demonstrating the individualized harm our standing doctrine requires may not be easy in the racial gerrymandering context, as it will frequently be difficult to discern why a particular citizen was put in one district or another." *Id.* at 744, 115 S.Ct. 2431. If a plaintiff can argue that he resides in a district created in violation of his rights to equal protection and on the basis of race, then that plaintiff clearly has standing. *See id.* at 745, 115 S.Ct. 2431. The Court went on, however, to say, "On the other hand, where a plaintiff does not live in such a district, ... any inference that the plaintiff has personally been subjected to a racial classification would not be justified absent specific evidence tending to support that inference .... [T]hat plaintiff would be asserting only a generalized grievance against governmental conduct of which he or she does not approve." *Id.; see also Bush v. Vera,* 517 U.S. 952, 957–58, 116 S.Ct. 1941, 135 L.Ed.2d 248 (1996).

The defendants assert that some of the plaintiffs lack standing to sue, arguing that there is a problem with standing in House Districts 19, 21, 26, 32, and 33. The defendants argue that, respectively, plaintiffs Stearns, Parker, Beatty, Mallory, and Yates, do not actually challenge the constitutionality of the reapportionment plan as to their own districts. Because the pur-

pose of this litigation is to resolve as fully as possible the question of the constitutionality of the 1991 Ohio reapportionment plan, for the purpose of this decision, we presume that all of the plaintiffs have standing to challenge the plan.

■ We turn now to the heart of the claim of vote dilution. The first of the plaintiffs' claims arises from the Voting Rights Act. In *Thornburg v. Gingles,* 478 U.S. 30, 106 S.Ct. 2752, 92 L.Ed.2d 25, (1986), the Supreme Court articulated three preconditions to a cognizable vote-dilution claim under Section 2 of the Voting Rights Act. The Sixth Circuit has described these preconditions as "a set of three necessary, but not sufficient, conditions for a plaintiff to succeed in a Voting Rights Act claim." *Mallory v. Ohio,* 173 F.3d 377, 380 (6th Cir.1999). *Gingles,* 478 U.S. at 50–51, 106 S.Ct. 2752 (internal citations omitted), states

> First, the minority group must be able to demonstrate that it is sufficiently large and geographically compact to constitute a majority in a single-member district.... Second, the minority group must be able to show that it is politically cohesive. If the minority group is not politically cohesive, it cannot be said that the selection of a multimember electoral structure thwarts distinctive minority group interests. Third, the minority must be able to demonstrate that the white majority votes sufficiently as a bloc to enable it ... usually to defeat the minority's preferred candidate.

These preconditions have been used since *Gingles* to inform and drive the debate about racially-motivated redistricting. Although *Gingles* pertained to multi-member districts, the Supreme Court extended its reasoning and holding to single-member districts in *Growe v. Emison,* 507 U.S. 25, 40, 113 S.Ct. 1075, 122 L.Ed.2d 388 (1993) ("It would be peculiar to conclude that a vote-dilution challenge to the (more dan-

gerous) multimember district requires a higher threshold showing than a vote-fragmentation challenge to a single-member district.").

The defendants first argue that the plaintiffs have failed to carry their burden on the first *Gingles* precondition: showing that African–American populations in the districts at issue are sufficiently large and geographically compact to constitute a majority. As the defendants point out, the plaintiffs have failed to show in any challenged district that the district might be redrawn to constitute a majority/minority district, in a way consistent with Article XI of the Ohio Constitution.

■ The plaintiffs argue that the first *Gingles* precondition is not fully applicable here because they are merely seeking "influence districts" and the prevention of influence-dilution. An influence district is one where a distinct group cannot form a majority, but they are sufficiently large and cohesive to effectively influence elections, getting their candidate of choice elected. The plaintiffs cite to Footnote 2 of *Uno v. City of Holyoke,* 72 F.3d 973, 979 (1st Cir.1995) (parallel citations omitted), as support for their argument that the first *Gingles* precondition is inapplicable to influence claims:

> This precondition will have to be reconfigured to the extent that the courts eventually validate so-called influence dilution claims. *See Voinovich v. Quilter,* 507 U.S. 146, 156–160, 113 S.Ct. 1149, 122 L.Ed.2d 500 (1993) (discussing treatment of claims brought on behalf of persons who constitute a potentially influential bloc, but less than the majority, within the relevant electorate, and raising prospect that the first *Gingles* precondition may have to be "modified or eliminated"). The lower courts are divided on the subject, *compare Armour v. Ohio,* 775 F.Supp. 1044, 1052

(N.D.Ohio 1991) (three-judge panel) (recognizing influence dilution claim) *with McNeil v. Springfield Park Dist.*, 851 F.2d 937, 947 (7th Cir.1988) (rejecting influence dilution claim), cert. denied, 490 U.S. 1031, 109 S.Ct. 1769, 104 L.Ed.2d 204, (1989), and the Supreme Court has declined on four occasions to decide whether such claims are cognizable under VRA § 2. *See [Johnson v.] De Grandy*, 512 U.S. [997, 1008–9, 114 S.Ct. 2647, 129 L.Ed.2d 775 (1994) ] . . .; *Voinovich*, 507 U.S. at 156–160, 113 S.Ct. 1149 . . .; *Growe v. Emison*, 507 U.S. 25, 41 n. 5, 113 S.Ct. 1075, 122 L.Ed.2d 388 . . ., *Gingles*, 478 U.S. at 46–47 n. 12, 106 S.Ct. 2752.

While plaintiffs are correct that the First Circuit and the Supreme Court have not yet ruled on influence districts, we are bound by precedent in this circuit. In *Cousin v. Sundquist*, 145 F.3d 818, 828 (6th Cir.1998), the Sixth Circuit held, "[W]e do not feel that an 'influence' claim is permitted under the Voting Rights Act." *See also O'Lear v. Miller*, 222 F.Supp.2d 862 (E.D.Mich.2002). Because influence claims are not cognizable in our circuit and the plaintiffs have failed to establish the first *Gingles* precondition, we see no need to discuss whether or not plaintiffs satisfy the second and third preconditions. The plaintiffs' claim under Section 2 of the Voting Rights Act must fail.

 We turn to plaintiffs' claims under the Fourteenth and Fifteenth Amendments. A Fourteenth Amendment claim is distinct from a vote dilution claim, as the Supreme Court stated in *Miller v. Johnson*, 515 U.S. 900, 911, 115 S.Ct. 2475, 132 L.Ed.2d 762 (1995) (internal citations omitted):

*Shaw [v. Reno*, 509 U.S. 630, 652, 113 S.Ct. 2816, 125 L.Ed.2d 511 (1993) ] recognized a claim 'analytically distinct' from a vote dilution claim. . . . Whereas a vote dilution claim alleges that the

State has enacted a particular voting scheme as a purposeful device 'to minimize or cancel out the voting potential of racial or ethnic minorities,'an action disadvantaging voters of a particular race, the essence of the equal protection claim recognized in *Shaw* is that the State has used race as a basis for separating voters into districts.

 In order to assert a successful claim under the Fourteenth Amendment, plaintiffs must show that race was a predominant factor in drawing district lines in the reapportionment process. As Justice O'Connor stated in *Shaw*, "The Equal Protection Clause provides that '[n]o State shall . . . deny to any person within its jurisdiction the equal protection of the laws.' U.S. Const., Amdt. 14, § 1. Its central purpose is to prevent the States from purposefully discriminating between individuals on the basis of race." 509 U.S. at 642, 113 S.Ct. 2816. For the plaintiffs to succeed, they must carry the burden of showing, "either through circumstantial evidence of a district's shape and demographics or more direct evidence going to legislative purpose, that race was the predominant factor motivating the legislature's decision to place a significant number of voters within or without a particular district." *Miller*, 515 U.S. at 916, 115 S.Ct. 2475. The Supreme Court clarified this showing, *id.* (citing *Shaw* ):

[A] plaintiff must prove that the legislature subordinated traditional race-neutral districting principles, including but not limited to compactness, contiguity, and respect for political subdivisions or communities defined by actual shared interests, to racial considerations. Where these or other race-neutral considerations are the basis for redistricting legislation, and are not subordinated to race, a State can 'defeat a claim that a

district has been gerrymandered on racial lines.'

The defendants argue that the reapportionment plan was derived through race-neutral principles, those provided by the Ohio Constitution, specifically Article XI, which requires that political subdivisions generally may not be split. OH CONST. Art. XI, § 7. Defendant Borgemenke testified that the predominant basis for the decisions made in drafting the new apportionment plan was this article of the Ohio Constitution.

As the Supreme Court said in *Miller*, "Although race-based decisionmaking is inherently suspect, until a claimant makes a showing sufficient to support that allegation the good faith of a state legislature must be presumed." 515 U.S. at 915, 115 S.Ct. 2475 (internal citations omitted). The plaintiffs maintain they have made a sufficient showing of race-based decisionmaking with their evidence, but the burden to establish that race was the predominant factor at work in the redistricting is high. *See Easley v. Cromartie*, 532 U.S. 234, 240–1, 121 S.Ct. 1452, 149 L.Ed.2d 430 (2001).

The plaintiffs have presented no evidence as to the districts' shapes or contiguity, nor have they presented sufficient evidence of impermissible legislative purpose. The plaintiffs rest on two pieces of evidence. First, they claim that a phone conversation between the chief of staff to Defendant Speaker Householder and an unsuccessful Republican candidate for the State House demonstrates the predominance of race as a factor in the reapportionment plan. The chief of staff made a statement, unwittingly recorded, about having moved 13,000 African–Americans from House District 28 and having added 14,000 Republicans. The chief of staff was attempting to convince the unsuccessful Republican candidate to withdraw from a primary contest against the Republican

Caucus-endorsed candidate. Even though there were significant geographical changes in the configuration of District 28, there was no significant change in the African–American voting age population. Defendants argue that the chief of staff lied and that changes to the House Districts at issue are explained by their populations alone. The districts were unconstitutionally "light" or "heavy" in population, and municipalities were moved into new districts, consistent with the Ohio Constitution.

Second, the plaintiffs claim that the official reapportionment plan was never properly submitted to the NAACP for approval, instead being presented by a witness in the case, Johnson, who they claim had unfair and undisclosed biases in presenting the plan, because he was hired as a consultant to the Republican members of the Legislative Task Force.

These pieces of evidence are insufficient to show that the predominant factor in devising the redistricting plan was race. Because we must presume that the state acted in good faith until a sufficient showing is made otherwise, the plaintiffs' Fourteenth Amendment claim fails.

■ Finally, we turn to the plaintiffs' claim under the Fifteenth Amendment. The Supreme Court has stated, "This Court has not decided whether the Fifteenth Amendment applies to vote-dilution claims; in fact, we never have held any legislative apportionment inconsistent with the Fifteenth Amendment." *Voinovich*, 507 U.S. at 159, 113 S.Ct. 1149. To effectively make this claim, however, the plaintiffs need to show that the redistricting and reapportionment plan was intentionally discriminatory toward African–Americans. *See id.* As discussed in the context of the Fourteenth Amendment claim, the plaintiffs simply have not put forth sufficient evidence to establish that the State of Ohio, by its Apportionment Board, inten-

tionally discriminated against citizens of Ohio on the basis of race. The plaintiffs' Fifteenth Amendment claim must fail as well.

For the foregoing reasons, we find in favor of the defendants. All the judges agree as to this outcome, although they do so for different reasons. Those reasons are stated in their concurring opinions.

The Clerk is directed to enter judgment in favor of the defendants.

GRAHAM, District Judge, concurring.

I concur with Chief Judge Martin's opinion, with the exception of his treatment of the issue of standing as respects four of the house districts challenged by the plaintiffs. Defendants have moved for partial summary judgment on the ground that there are no plaintiffs who have standing to challenge the redistricting of House Districts 19, 21, 27 and 32. Defendants assert that those plaintiffs who reside in these districts have no objection to their configuration, and that the remaining plaintiffs, who are not residents of these districts, do not have standing to challenge their configuration.

The Supreme Court has held that non-residents of allegedly racially gerrymandered districts have not suffered "a cognizable injury under the Fourteenth Amendment." *United States v. Hays,* 515 U.S. 737, 746, 115 S.Ct. 2431, 132 L.Ed.2d 635 (1995). In *Shaw v. Hunt,* 517 U.S. 899, 904, 116 S.Ct. 1894, 135 L.Ed.2d 207 (1996), the Supreme Court reaffirmed and summarized the rule of *Hays,* as follows:

In *United States v. Hays,* 515 U.S. 737, 115 S.Ct. 2431, 132 L.Ed.2d 635 (1995), we recognized that a plaintiff "who resides in a district which is the subject of a racial gerrymander claim has standing

to challenge the legislation which created that district, but that a plaintiff from outside that district lacks standing absent specific evidence that he personally has been subjected to a racial classification."

The same rules for standing should apply to plaintiffs' claims under § 2 of the Voting Rights Act, 42 U.S.C. § 1973, which was enacted to enforce the guarantees of the Fourteenth and Fifteenth Amendments.[1] Nonresidents of House Districts 19, 21, 27 and 32 are not aggrieved persons with respect to the configuration of those districts. Their right to vote is not affected by the configuration of those districts. None of the nonresident plaintiffs has produced evidence that he or she has been subjected to a racial classification.

Plaintiffs bear the burden of proving their standing to challenge particular districts. *Hays,* 515 U.S. at 743–45, 115 S.Ct. 2431. Plaintiff Stern, who lives in House District 19, admitted in his deposition that he had no complaint about how his district was configured. Exhibit 46, Stern Depo. at 18. Plaintiff Parker was asked during his deposition to identify any house districts with which he disagreed in respect to their configuration. Parker said, "None specifically that I can name at this point." Parker Depo. at 36. At trial, Parker testified that although he objected to the new districts in Franklin County in general, he had not examined the configuration of House District 21, the district in which he resides, "to any great extent." Trial Tr. at 263. Plaintiff Beatty was asked during her deposition whether she had any objections to the configuration of her district, House District 27. She said, "I don't have any major objection.... I did prefer some of the areas that I had in my previous

**1.** For example, § 3 of the Act provides for the appointment of federal examiners when the Attorney General or "an aggrieved person" institutes a proceeding "under any statute to enforce the voting guarantees" of the Fourteenth and Fifteenth Amendments. 42 U.S.C. § 1973a.

district that I no longer have." Exhibit 45, Beatty Depo. at 11–12. Beatty also testified that she consented to become a plaintiff in this case because "it allows for some diversity of representatives across the state." Beatty Depo. at 16. Plaintiff Mallory testified in his deposition that he had no objections to House District 32, the district in which he resides. Mallory Depo. at 30. At trial, Mallory testified that House District 32 was "fine," but that some African–American voters residing there should be transferred to an adjacent district, and that his objections were to the configuration of the adjacent district. Trial Tr. at 32, 326.

No other plaintiffs are residents of House Districts 19, 21, 27 and 32. None of the nonresident plaintiffs have standing to challenge the configuration of those districts. I would grant defendants' motion for summary judgment on the issue of standing with respect to House Districts 19, 21, 27 and 32.

I concur with Judge Gwin's finding that plaintiffs have failed to demonstrate that the white majority votes sufficiently as a block to enable it to defeat the minority's preferred candidate, and I agree with his analysis of the evidence on that issue.

However, I disagree with Judge Gwin's suggestion that influence claims are permitted under § 2 of the Voting Rights Act. This issue was squarely addressed by the Sixth Circuit Court of Appeals in *Cousin v. Sundquist*, 145 F.3d 818, 828–29 (6th Cir. 1998) ("We believe the district court erred in assuming from the *Gingles* footnote and the Senate Report that an influence claim is actionable under Section 2.") Since the court in *Sundquist* rejected one of plaintiffs' claims as an impermissible influence claim, and also rejected plaintiffs' proposed two-district system on that basis, it is inac-

curate to characterize the court's ruling as "dicta." I also believe that *Sundquist* is binding authority for three-judge district courts sitting within the Sixth Circuit. As Judge Gwin has pointed out, a majority of three-judge district courts and circuit courts of appeals hold that circuit court precedent is binding on a three-judge district court.

Even if we were not bound by *Sundquist*, I would find that influence claims are not authorized under § 2 of the Voting Rights Act for the same reasons that the court in *Sundquist* and other courts and judges have rejected influence claims. *See Sundquist*, 145 F.3d at 828–29; *McNeil v. Springfield Park Dist.*, 851 F.2d 937, 944, 947–48 (7th Cir.1988) ("Movement away from the *Gingles* standard invites courts to build castles in the air, based on quite speculative foundations."); *Hastert v. State Bd. of Elections*, 777 F.Supp. 634, 654 (N.D.Ill.1991) ("We perceive the *Gingles* electoral district majority precondition as the only rational measure for limiting voter group size under the Voting Rights Act."); *Armour v. State of Ohio*, 775 F.Supp. 1044, 1082 (N.D.Ohio 1991) (Batchelder, J., dissenting) ("Such a limitless and standardless cause of action is too ambiguous and unenforceable to be valid."). *See also DeBaca v. County of San Diego*, 794 F.Supp. 990, 996–97 (S.D.Cal. 1992) (rejecting *Armour* and following *Hastert*).

If influence claims are permitted, then any system of districting, no matter how fair and impartial in its conception, is subject to attack unless it pools minority voters in sufficiently large enclaves so that they can "influence" the result of elections. This would transfer the principle of "one man—one vote" into "one group—one election victory." [2]

---

**2.** *See Armour v. State of Ohio*, No. 88–4040, 1990 WL 8710 at *10 (6th Cir. Feb.7, 1990)

(Guy, J., dissenting) (opinion withdrawn).

GWIN, District Judge.

While I concur with the decision to give judgment to the defendants, I do so for different reasons. The majority relies upon an interpretation of *Thornburg v. Gingles*, 478 U.S. 30, 106 S.Ct. 2752, 92 L.Ed.2d 25 (1986) that requires minorities to constitute a majority of the voting population before bringing a claim under Section 2 of the Voting Rights Act ("the Act"), 42 U.S.C. § 1973(a). I believe such a holding is both unnecessary to the case before us and also likely wrong. Instead, I believe the plaintiffs' claims fail because they do not show that the White majority votes sufficiently as a block to enable it to usually defeat the minority-preferred candidate.

Section 2 of the Act addresses electoral procedures that cause minority voters to have "less opportunity than other members of the electorate to participate in the political process." 42 U.S.C. § 1973(b). Section 2 prohibits a state from creating districts that dilute the ability of minority group members to elect representatives of their choice. *Gingles*, 478 U.S. at 46–47, 106 S.Ct. 2752. To prevail on a Section 2 claim, the party challenging the redistricting plan must prove that the application of the plan will operate, or has operated, to reduce or cancel the ability of minority voters to elect their preferred candidates. *Id.* at 48, 106 S.Ct. 2752.

In 1982, Congress significantly broadened the ability to seek redress under the Act. The 1982 amendments to Section 2 of the Act responded to the Supreme Court's decision, *Mobile v. Bolden*, 446 U.S. 55, 100 S.Ct. 1490, 64 L.Ed.2d 47 (1980), a decision that required plaintiffs to show discriminatory intent to prove a vote-dilution claim on either constitutional or statutory grounds. In response to this narrow reading by the Court, Congress amended Section 2 of the Act to overrule the restrictive "intent" test established in *Bolden*. Congress instead adopted a "results" test.[1] In addition, Congress directed courts to consider nine explicit factors when determining the validity of a Section 2 claim. In setting out factors for Courts to consider, Congress set no requirement as to the percentage of voters minority populations must have before they could challenge an election practice. Instead Congress directed courts to consider "the totality of circumstances."

An act or procedure violates the Act if it causes a minority group to have "less opportunity than other members of the electorate to participate in the political process and elect representatives of their choice." 42 U.S.C. § 1973, *accord* Beth A. Levene, *Influence–Dilution Claims Under the Voting Rights Act*, 1995 U. Chi. Legal F. 457, 466. The legislative history of the Act shows that Congress sought to ensure

1. As amended, 42 USC § 1973(a)-(b) (1988) reads:

 (a) No voting qualification or prerequisite to voting or standard, practice, or procedure shall be imposed or applied by any State or political subdivision in a manner which results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color ... as provided in subsection (b) of this section.
 (b) A violation of subsection (a) of this section is established if, based on the totality of circumstances, it is shown that the political processes leading to nomination or election in the State or political subdivision are not equally open to participation by members of a class of citizens protected by subsection (a) of this section in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice. The extent to which members of a protected class have been elected to office in the State or political subdivision is one circumstance which may be considered: Provided, That nothing in this section establishes a right to have members of a protected class elected in numbers equal to their proportion in the population.

minority groups' ability to meaningfully participate in elections, not just elect candidates of their choice. *See* S.Rep. No. 97–417, at 29 n. 115 (1982). The Senate Report notes, "the issue to be decided under the results test is whether the political processes are equally open to minority voters." *Id.* at 2. As one commentator notes, influence claims are consistent with the purposes of the Act because " 'political effectiveness' not only includes the power to elect, but also ... the ability to use a group's voting strength to persuade candidates to address particular issues." Levene, *supra* at 468.

In *Gingles,* the Supreme Court reviewed North Carolina's at-large state election scheme. Despite a lack of indication that Congress intended to limit Section 2 claims, the Court identified certain conditions that a plaintiff must establish before proceeding to the more general factors Congress set out in 42 U.S.C. § 1973(b). As to challenges to at-large districts, the *Gingles* Court required the challenger show that it: 1) is sufficiently large and geographically compact to make up a majority in a single-member district, 2) that the minority group is politically cohesive, and 3) that White voters have discriminatorily blocked the minority population from electing their preferred candidate. *Gingles,* 478 U.S. at 50–51, 106 S.Ct. 2752.

While requiring that challengers to at-large districts show a majority in a single member district, the Court disclaimed an intent to deal with single-member district challenges:

We have no occasion to consider ... what standards should pertain to ( ) a claim brought by a minority group, that is not sufficiently large and compact to constitute a majority in a single-member district, alleging that the use of a multi-member district impairs its ability to influence elections.

*Id.* at 46–47 n. 12, 106 S.Ct. 2752.

After *Gingles,* the Court has explicitly avoided deciding whether a plaintiff can bring a claim absent a showing that the minority makes up most of the voters in a single-member district. In *Growe v. Emison,* 507 U.S. 25, 41, 113 S.Ct. 1075, 122 L.Ed.2d 388 (1993), the Court used the *Gingles* factors in deciding a challenge to a single-member district but the Court expressly declined to decide whether plaintiffs could make influence dilution claims absent a minority-majority population. *Id.* at 41 n. 5, 106 S.Ct. 2752.

The Court's decision in *Voinovich v. Quilter,* 507 U.S. 146, 113 S.Ct. 1149, 122 L.Ed.2d 500 (1993), is even more relevant to whether a plaintiff can make an influence claim where the minority population makes up less than a majority of the voting age population. In *Voinovich,* the minority plaintiffs argued that their Section 2 rights were violated when the reapportioning body failed to construct influence districts, districts where minorities make up less than a majority of the voting age population but where they could join with others to elect preferred candidates.[2] Despite facing the issue of whether plaintiffs from districts with less than a minority-majority population could make claims, the

---

**2.** The Court described the claim:

Appellees in this case, however, do not allege that Ohio's creation of majority-black districts prevented black voters from constituting a majority in additional districts. Instead, they claim that Ohio's plan deprived them of "influence districts" in which they would have constituted an influential minority. Black voters in such influence districts, of course, could not dictate electoral outcomes independently. But they could elect their candidate of choice nonetheless if they are numerous enough and their candidate attracts sufficient cross-over votes from white voters.

507 U.S. at 154, 113 S.Ct. 1149.

Supreme Court again declined to reach the issue. Explaining its treatment of the *Gingles* multimember district requirement that the minority population be sufficient to constitute a majority in a district, the Court held:

> Of course, the *Gingles* factors cannot be applied mechanically and without regard to the nature of the claim. For example, the first *Gingles* precondition, the requirement that the group be sufficiently large to constitute a majority in a single district, would have to be modified or eliminated when analyzing the influence-dilution claim we assume, *arguendo,* to be actionable today. *Id.* at 1155. The complaint in such a case is not that black voters have been deprived of the ability to constitute a majority, but of the possibility of being a sufficiently large minority to elect their candidate of choice with the assistance of cross-over votes from the white majority. *See ibid.* We need not decide how *Gingles'* first factor might apply here, however, because appellees have failed to demonstrate *Gingles'* third precondition-sufficient white majority block voting to frustrate the election of the minority group's candidate of choice.

*Id.* at 158, 113 S.Ct. 1149.

The *Voinovich* Court ruled against the appellees because they had failed to show that Whites voted as a block. If the *Voinovich* Court had intended to stop influence claims in districts where minorities do not make up a majority, it could have made that finding on a legal basis. Instead it engaged in a factual review that required it to decide whether, under a clear error analysis, sufficient evidence supported the district court's finding that White voters did not vote as a block.

In *Johnson v. De Grandy,* 512 U.S. 997, 1009, 114 S.Ct. 2647, 129 L.Ed.2d 775 (1994), the Court again declined to find that plaintiffs could not make influence claims. ("As in the past, we will assume without deciding that even if Hispanics are not an absolute majority of the relevant population in the additional districts, the first *Gingles* condition has been satisfied in these cases.")

Beyond its repeated failure to impose the minority-majority condition upon Section 2 claims challenging a single-member district, the Court has emphasized that courts should not quickly apply judicially crafted limitations to Section 2 litigation. In *Chisom v. Roemer,* 501 U.S. 380, 111 S.Ct. 2354, 115 L.Ed.2d 348 (1991), the Court stated a philosophy of affording a hearing to claims without judicially created limitations:

> [T]he standard that should be applied in litigation under Section 2 is not at issue here. Even if serious problems lie ahead in applying the totality of the circumstances described in Section 2(b), that task, difficult as it may prove to be, cannot justify a judicially created limitation on the coverage of the broadly worded statute, as enacted and amended by Congress.

501 U.S. at 416, 111 S.Ct. 2354.

The majority finds that plaintiffs fail to meet the first prong of the *Gingles* test. The plaintiffs argue that the first prong of the *Gingles* test does not apply because their claims are "influence claims." The plaintiffs point to First Circuit authority that supports this argument. *See Uno v. City of Holyoke,* 72 F.3d 973, 979 (1st Cir.1995). *See also Armour v. Ohio* 775 F.Supp. 1044, 1052 (N.D.Ohio 1991) (three judge panel) (recognizing validity of influence claim). Also, as described above, the Supreme Court has gone out of its way to avoid applying the first prong of *Gingles* to stop influence claims.

Lacking any clear Supreme Court holding requiring minority-majority status before a Section 2 claim can be made in a

single-member district, the majority relies upon *Cousin v. Sundquist,* 145 F.3d 818, 828 (6th Cir.1998). In *Sundquist,* the Sixth Circuit reviewed a Section 2 challenge to Tennessee's at-large method for electing judges. The *Sundquist* Court explicitly did not reach a determination whether the plaintiffs needed to show a sufficiently large and geographically compact concentration to constitute a majority in a district:

> Since we conclude that the plaintiffs failed to meet the third pre-condition, we need not conduct a detailed inquiry into the first factor, the geographic compactness of blacks in Hamilton County...

145 F.3d at 823. The *Sundquist* Court then relied upon its finding that there was insufficient evidence showing that Whites voted as a block to defeat minority favored candidates. In declining to rest its decision on the failure to show minorities made up a majority in the challenged district, the *Sundquist* Court relied upon the Supreme Court's failure to reach this issue in *Voinovich.* 145 F.3d at 823 (citing *Voinovich v. Quilter,* 507 U.S. 146, 158, 113 S.Ct.

1149, 122 L.Ed.2d 500 (1993)). *See also, Gingles,* 478 U.S. at 50, 106 S.Ct. 2752.

As with *Voinovich,* the *Sundquist* Court then reviewed the trial court's finding that Whites voted as a block to defeat minority preferred candidates for clear error. 145 F.3d at 823. The *Sundquist* Court's discussion of the first *Gingles* condition is obvious dicta. If the Sixth Circuit intended to stop influence claims for districts where minorities did not make up a majority of voters, why would it undertake the detailed factual analysis necessary to reverse the district court's finding that the White majority voted as a block? Stated otherwise, why make the effort if the Sixth Circuit intended to stop influence claims because the minority complainants could not show they made up a majority in the voting district? [3]

The majority also relies upon *O'Lear v. Miller,* as authority against the viability of influence claims. However, *O'Lear* does not bind this Court. The *O'Lear* court, like the majority here, misread *Sundquist* as binding authority. *O'Lear v. Miller,* 222 F.Supp.2d 850, 860–61(E.D.Mich.2002). Second, even if *O'Lear* did not base its

---

**3.** Some question exists whether the Sixth Circuit's opinion in *Sundquist* would control us in any regard. Does the Sixth Circuit's opinion constitute *stare decisis* on a statutory three-judge district court? Congress directs that voting rights claims be heard by a statutory three-judge district court, *see* 28 U.S.C. § 2284, with appeal directly to the Supreme Court, thereby bi-passing the Circuit Court of Appeals. *See id.* The doctrine of *stare decisis* in practice, commands that lower courts follow the precedent of courts who review their decisions. If our decision is reviewable only by the Supreme Court, logic suggests that we are not bound by circuit authority. While such authority may persuade, only Supreme Court holdings would seem to have controlling authority.

At least one statutory three-judge district court agrees. *See Jehovah's Witnesses in Washington v. King County Hosp.,* 278 F.Supp. 488, 502–3 (W.D. Wash. 1967)("In

this special three-judge court case we are not bound by any judicial decisions other than those of the United States Supreme Court."). In contrast, a majority of three-judge district courts and circuit courts disagree. *See Baksalary v. Smith,* 579 F.Supp. 218, 227 (E.D.Penn. Feb. 1, 1984); *Finch v. Mississippi State Medical Ass'n., Inc.,* 585 F.2d 765, 773 (5th Cir.1978); *Lewis v. Rockefeller,* 431 F.2d 368, 371 (2d Cir.1970); *Russell v. Hathaway,* 423 F.Supp. 833, 835 (N.D.Tex.Dec.10, 1976); *Hopson v. Schilling,* 418 F.Supp. 1223, 1234–35 n. 15 (N.D.Ind. July 15, 1976); *Athanson v. Grasso,* 411 F.Supp. 1153, 1157 (D.Conn. 1976), *Alabama NAACP State Conference of Branches v. Wallace,* 269 F.Supp. 346, 350 (M.D.Ala. May 3, 1967). However, these three judge district courts follow circuit precedent without clear explanation of why such precedent should control courts who are not reviewed by those circuits.

holding on dicta, *O'Lear* would not control this Court, as another statutory three district judge court rendered the decision. The decisions of statutory three-judge district courts do not bind other statutory three-judge district courts. *See, San Diego Unified Port Dist. v. Gianturco,* 651 F.2d 1306, 1316 (9th Cir.1981); *see also, Lewis v. Rockefeller,* 431 F.2d 368, 371 (2d Cir.1970) ("A district court . . . convened as a statutory three-judge panel . . . still is sitting as a district court for purposes of *stare decisis*"); *see also,* P. Bator, P. Mishkin, D. Shapiro, & H. Wechsler, Hart & Wechsler's *The Federal Courts and the Federal System,* 967–79 (2d ed.1973) ("purpose of a three-judge court . . . was not to add a greater than normal authority or finality to its decision"). For these reasons *O'Lear* does not control our decision. To the extent it is offered as persuasive authority, it fails to offer a reasoned explanation why claims under Section 2 should be limited to districts where minorities make up a majority of voters.

If required to decide, by the facts presented herein, I would find strong support for allowing influence claims. Most important, nothing suggests that Congress intended to limit Section 2 claims to ones involving districts where minorities were a majority of voters. The Supreme Court has also suggested that a minority influence claim may be sufficient to sustain a Section 2 results claim. In *Chisom v. Roemer,* 501 U.S. 380, 111 S.Ct. 2354, 115 L.Ed.2d 348 (1991), the Court stated that to establish a Section 2 claim, the plaintiffs must show both that they have less opportunity to participate in the political process and that they have less opportunity to elect representatives of their choice. Justice Scalia dissented, arguing that this reading of Section 2 would leave "minorities who form such a small part of the electorate in a particular jurisdiction that they could on no conceivable basis 'elect representatives of their choice' " entirely

without Section 2 protection. *Id.* at 409, 111 S.Ct. 2354. He further reasoned that such minorities could therefore be denied equal opportunity to participate in the political process with impunity. *Id.* The majority responded to Justice Scalia's dissent by pointing out that his argument "rested on the erroneous assumption that a small group of voters can never influence the outcome of an election." *Id.* at 397 n. 24, 111 S.Ct. 2354. Thus, the Court suggested that influence claims can be valid under Section 2 of the Act.

■ The majority gives judgment to the defendants after finding African–American voters are not able to show that they could constitute a majority in any proposed district. As explained above, I am not convinced that plaintiffs are required to make such a showing. Yet more important for our present circumstances, we need not reach this issue because the plaintiffs have failed "to demonstrate that the White majority votes sufficiently as a bloc to enable it . . . to defeat the minority's preferred candidate." *Thornburg v. Gingles,* 478 U.S. at 50, 106 S.Ct. 2752.

In support of their argument that White majority voters do not vote as a block to defeat the minority's preferred candidate, the defendants first point to Ohio election returns in recent years. During the period 1992—2000, African–American candidates won seventy-four of eighty-four races. Of the races lost, one involved an African–American running as an independent and most of the other results involved an African–American Democrat running in a Republican leaning district.

In Ohio, African–Americans make up 11.46% of the population. Although having less than 12% of the population, African–Americans held 14% of the Ohio House seats and 12% of the Ohio Senate seats after the 2000 election. African–Americans candidates won these seats with

significant White crossover votes. Since 1991, African–Americans have held four Senate seats, only one of which has a minority-majority African–American voting age population. African–American candidates won three Ohio Senate Seats with African–American voting age population of 27.21%, 39.04%, and 32.28% respectively. African–Americans won these seats with significant White crossover votes.

In the 2000 election, fourteen African–American candidates won election to the Ohio House, usually with significant White support. Of the fourteen African–Americans elected in 2000, only four were from minority-majority African–American districts. Five of these candidates won election to the Ohio House from districts with less than 40% African–American voting age population. After correcting for methodology errors, the defendants' expert, Dr. King[4], found that the candidate of choice of the African American community won in twenty-seven of thirty-four races. While such success alone does not establish that Whites do not vote as a block, it is certainly relevant.[5] *Gingles,* 478 U.S. at 99, 106 S.Ct. 2752 ("[T]he relative lack of minority electoral success under a challenged plan, when compared with the success that would be predicted under the measure of undiluted minority voting strength the court is employing, can constitute powerful evidence of vote dilution").

The defendants provided persuasive statistical evidence showing that Ohio has little racially polarized voting in relevant elections, which is important to our consideration whether the plaintiffs established that Whites vote as a block, thereby denying minorities opportunity to meaningfully participate.

Dr. King gave persuasive testimony suggesting that Ohio has little significant racially polarized voting in Ohio General Assembly elections.[6] After correcting for errors, Dr. King reviewed Ohio elections over the 1990—2000 time frame. He first sought to set up a control group. To control for differing party loyalties between African–Americans and Whites, King compared elections where an African–American Democrat candidate faced a White Republican candidate. He then contrasted the results of these elections with races where a White Democrat faced a White Republican. King then compared the degree of different voting between African–Americans and Whites to see what influence the race of the candidate had in the vote. King described the results after reviewing 123 elections from across Ohio:

> So what we can look at here is the degree of racially polarized voting overall, but then given different treatments, that is given different sets of candidates, so let's start with a white Democrat versus a white Republican. When a white Democrat runs against a white

---

4. Dr. King, a Professor of Government at Harvard University and Director of the Harvard Data Center, is trained in both political science and statistics. King specializes in statistical analysis of social issues including the quantitative review of voting trends to decide whether racially polarized voting is present. He has published extensively and is credited with developing methods and application of quantitative methods to redistricting.

5. Professor King developed a regression analysis improving on the long-utilized "Good-

man's Regression." Goodman's regression often gives incorrect results. Dr. King's analysis starts with Goodman's regression and improves it by correcting for information known to be true. Dr. King's analysis has received high praise and peer acceptance and use.

6. Racially polarized voting or racial block voting is the difference between the percent of Blacks voting for a candidate and the percent of Whites voting for that candidate.

Republican, the degree of racially polarized voting is about 31.7 percent. Very interestingly, when the Democrats decide instead to nominate an African–American, that number stays almost exactly the same. The number beneath it is 31.8 percent. That's fairly remarkable. In fact it's quite remarkable, and it's a tribute to the people of Ohio, essentially, that a different type of candidate is nominated and people are responding in very similar ways.

In fact you can look at the individual black and white behavior to dissect this a little further. What happens when a white Democrat runs against a white Republican among black voters? About 79 percent of them give their support to the Democratic candidate. What happens when the Democrats decide to run blacks? More blacks vote for the black Democrat. It goes from 79.4 to 84.4. That's very interesting, but it's not surprising. But what is very interesting is that whites are doing the same thing. Whites give 47.7 percent to the white Democrats when it's a white Democrat running, and their support for the Democratic candidate also increases when the Democrats run a black; it increases to 52.6 percent. The result overall is that the degree of racially polarized voting, the difference between the first and second column, doesn't really change.

Section 2 applies when Whites and racial minorities consistently prefer different candidates at the polls. Section 2 prohibits a state from drawing district lines that take advantage of these differing preferences to give White preferred candidates a majority in a disproportionate share of districts and prevent minority voters from electing candidates of their choice. Plaintiffs must show that the local majority votes as a block. Evidence regarding the success of the minority's preferred candidates speaks to whether such majority block voting occurs. *See Gingles*, 478 U.S. at 51, 106 S.Ct. 2752 ("It is obvious that

unless minority group members experience substantial difficulty electing representatives of their choice, they cannot prove that a challenged electoral mechanism impairs their ability 'to elect.' ")

Here, the persuasive evidence before the Court shows that Ohio's majority White voters do not vote in a block. Having failed to show significant differences in the preferences of White and minority voters, the plaintiffs do not establish the core consideration necessary to succeed with their Section 2 claim that the defendants used a significant racial voting disparity to apportion districts to defeat minority participation. Failing such a showing, we must give judgment to the defendants.